ORANGE CIRCUIT. 589

Gilbert W. Oliver v. The New York and Erie Railroad Company.

## ORANGE CIRCUIT.

OCTOBER, 1848.

Before EDMONDS, Justice.

GILBERT W. OLIVER v. NEW YORK AND ERIE RAILROAD CO.

A railroad company in carrying passengers is bound to carry those whom it takes into its cars, safely as far as human foresight and care will go, and to use the utmost care and diligence of very cautious persons.

Where it appeared that the accident happened from the breaking of a wheel which had been previously cracked, but which crack had not been previously discovered owing to an imperfect inspection of it by the officers of the company, and from the prostration of a bridge which had been so imperfectly constructed as not to be strong enough to guard against the accident, the company were guilty of negligence, and were responsible to parties injured.

The fact that the accident was one of frequent occurrence on railroads, affords no excuse, but on the contrary demands additional care and foresight to guard against it.

The inability of the company, for want of means, to build a better bridge, constitutes no defense, for the company ought not to have undertaken to carry passengers until it could do so with safety.

THIS was an action on the case tried at the Orange Circuit in October, 1848, to recover damages for an injury which the plaintiff had sustained while a passenger in the cars of the Erie Railroad Company, from an accident to the cars and the road.

It appeared that in July, 1846, the plaintiff took a passage in the cars of the defendants, which were running from Middletown to Piermont. The train consisted of five passenger cars, containing about 200 passengers, and three freight cars. While going at the rate of about twenty-five miles an hour, one of the wheels of the middle freight car broke, a segment, consisting of about one-third of the wheel, flew off, and that car, after running some ten rods on the track, ran off, and the broken wheel struck the cap of the bent of a bridge, which it knocked off; it then struck the next bent of the bridge, which it overthrew, whereby the bridge broke down into a chasm

twenty feet wide and twelve feet deep. The impetus of the train drew the freight cars over the broken bridge, but the first passenger car lodged in the chasm, and the next car was drawn on top of it, whereby several persons were killed and many were wounded.

The plaintiff was among the latter; one of his hands was permanently disabled, and one of his legs so severely injured as to render it nearly useless for life. He had spent many months in the hospital in New York, and after a lapse of two years was still unable to dress himself, or get about without assistance.

It appeared in evidence that the segment of the wheel which flew off, carried with it four of the spokes, three of which had broken off near the hub. From the appearance of the wheel it seemed that those three spokes had been broken off from the hub some time before the accident; how long before could not be ascertained, the witnesses expressing the opinion that the wheel must have run some distance in that broken condition, varying from ten to one hundred miles.

It further appeared in evidence that that train had gone up the night before from Piermont to Middletown, a distance of about sixty miles, and had gone on its return trip about thirty miles when the accident occurred. It was not the practice of the company to have its apparatus inspected at Middletown, except only so far as any thing out of order might be discovered by the brakeman (a common laborer) while he was engaged in oiling the wheels of the train. At the other end of the route it was, however, the practice, every time a train came in, to have it inspected. That inspection, however, was merely by a common laborer, unskilled in iron works, and was limited to a cursory examination by the eye, unless something was found out of order in some one of the cars, when it was sent to the work depot and overhauled by competent persons. It was conceded on all hands that a wheel thus broken was not in a proper condition to be used, and it was insisted by the defendants that it was not possible to detect the defect in the wheels by any inspection of them. But evidence was given that it

might be detected by sounding the wheel with a hammer, by prying upon the spokes with a crowbar, or by washing off the oil and dust, and examining it closely by the eyesight, and it was proved that, after the accident, all the wheels in use by the company had been subjected to such an inspection, and twenty-six of them had been cast aside, because broken in a similar manner. It was also in evidence that such breaking of wheels was a common accident on all railroads, where they were constructed with spokes, and that of late years solid wheels had been in common use instead of those with spokes.

It appeared that the bridge was constructed with four wooden bents, resting on mud sills, supported in an upright position by trestle braces, and having, on the top, caps, on which rested the road sills, into which the caps had been let by a groove of about half an inch deep. This groove and the trestle braces were all there was to sustain the bents against a lateral pressure, and they had consequently given away and fallen down as soon as they were struck by a wheel off the track. Evidence was given that several of the bridges on that road were of the same construction, and that they were very common in the early period of railroads in this country, especially where the company was limited in its means, as this company had been at one period. After the accident a box culvert had been built of stone, in the place of this bridge, and it was established in proof that if such had been the bridge at that place, at the time of this accident, the injury complained of in this suit would not have been inflicted. It also appeared that the company had, from a mistake as to the quantity of water in the stream over which the bridge had been erected, adopted a wider span than was necessary, and experience had demonstrated that the volume was small enough to permit the box culvert which had been subsequently adopted.

*S. A. Foote*, for defendants, insisted that the injury was the result of inevitable accident, and not of negligence; that it was not possible to detect the defect in the wheel, and that

the bridge, being constructed on a plan universally adopted, was of a sufficient and suitable construction.

*J. W. Brown, contra.*

*Edmonds, J.*, charged the jury that the defendants, as passenger carriers, bound themselves to carry safely those whom they took into their carriages, as far as human foresight and care would go, and were bound to use the utmost care and diligence of very cautious persons. That the question submitted to them was entirely one of negligence, the defendants not being responsible for inevitable accidents, but only for the want of due care.

As to the wheel, the breaking of which was the primary cause of the injury to the plaintiff, it was conceded that it was unsafe and improper to permit it to be used in the broken condition in which it must have been some time before the accident, and from this fact a presumption was raised of the want of due care and foresight, and it was for the defendants to satisfy the jury that due care and diligence had been used. That the breaking of such wheels being of common occurrence on railroads, it was the duty of the company to subject them to frequent and careful scrutiny to guard against accidents. That a mere cursory view of them, by persons unskilled in iron, was not such a scrutiny. And if the jury believed that the defect in the wheel in question could have been detected by an inspection of it, by persons well skilled, or in either of the modes mentioned in the evidence, by striking with a hammer, by prying with a crowbar, or by cleaning it of dirt and oil, then it was negligence in the company to have submitted its machinery to no further examination than a mere cursory view by two unskilled men, and they had not in respect to that wheel used the due care and diligence which was required of them.

As to the bridge, he charged the jury that if they were satisfied that a better one could have been built, that one could have been erected which would have avoided the accident, it

was negligence in the company to have erected the one which was the immediate cause of the injury to the plaintiff, and as it appeared that since the accident one had been erected in such manner that such an accident could not again occur there, it was proper for them to inquire whether the same thing could not have been done before, and if it could, then the company were guilty of negligence, and were responsible for the consequences, because they had not built as good a bridge as could be erected, and it was no excuse that they could not afford to build a better one; that if they could not afford to do all that the utmost care and diligence of very cautious persons could suggest for the protection of passengers, they ought not to have engaged in a business where so many lives were daily hazarded; and that if they had made a mistake as to the span of the bridge, the consequences must fall upon themselves, and they could not transfer them to the passengers. He also charged that a railroad company, using the tremendous power of steam, and a high rate of speed, which would necessarily greatly augment the consequences of an accident, were bound to see that all their erections and appliances were as perfect as the utmost care and precaution of human foresight could suggest, and that the men that they employed were as careful and as skillful as could be procured; that any omission of such precautions rendered the companies liable for the consequences, and that in awarding damages the jury ought to give such a sum as would not only remunerate the plaintiff, but would bring home to the companies a realizing sense of the rule which is to govern them in all their operations.

The jury, after being absent a short time, rendered a verdict of $8,000.